**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 20-cr-00148-CMA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  MICHAEL SANG CORREA,
     a/k/a MICHAEL CORREA,
     a/k/a SANG CORREA,
     a/k/a MICHAEL COREA,
     a/k/a MICHAEL SANG COREA,
     a/k/a SANG COREA,

     Defendant.

---

**THE GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT PURSUANT TO THE FIFTH
AMENDMENT DUE PROCESS CLAUSE**

---

Michael Correa engaged in barbaric acts of torture universally recognized as criminal, including against a dual citizen of the United States and The Gambia.  He then fled to the United States and used assumed names to escape responsibility for his crimes.  Because his prosecution for torture and conspiracy to commit torture does not violate the Fifth Amendment's Due Process Clause, this Court should deny his motion to dismiss the Indictment (Doc. # 98).

## Factual Background

The Gambia is a country located on the western coast of Africa.  (Doc. # 1 (hereinafter Indictment) ¶ 3).  President Dawda Jawara and the People's Progressive

Party ruled The Gambia until 1994.  In 1994, Lieutenant Yahya Jammeh and a group of junior officers overthrew Jawara's government.  Jammeh served as President until 2016, when he lost the presidential election to Adama Barrow; Jammeh stepped down in January 2017.

In March 2006, then-President Jammeh learned of a potential coup against his government.  *Id.* ¶ 16.  In response, Jammeh ordered the arrest and detention of numerous alleged coup plotters and others.  *Id.* ¶ 17.  Many of those arrested were taken to Mile 2 Prison near Banjul, the capital of The Gambia, and to the headquarters building of the National Intelligence Agency (NIA) in Banjul.  *Id.* ¶ 18.  At the NIA, detainees were interrogated about their participation in the coup attempt.  *Id.* ¶¶ 18, 30.  These individuals were also subjected to severe abuse by NIA personnel and by an armed unit known as the "Junglers."  *Id.* ¶ 31.  The Junglers, also known as the "Patrol Team," "Black Boys," or "Black-Blacks," were an armed unit that answered directly to then-President Jammeh.  *Id.* ¶¶ 12-13.  Correa was a member of the Junglers during this time period and actively participated in the abuses.  *Id.* ¶ 14.

At Jammeh's behest, Correa and his co-conspirators inflicted severe physical and mental abuse on these individuals accused of participating in the coup against the Gambian government to coerce the victims into giving confessions.  *Id.* ¶ 31.  Correa and his co-conspirators repeatedly beat victims with their fists, feet, boots, and objects including plastic pipes, wires, and branches.  *Id.* ¶¶ 33-38.  They sometimes covered the victims' heads with plastic bags, restricting their ability to breathe, and subjected some victims to electrocution on various parts of their bodies, including their genitals.  *Id.* ¶¶ 34-38.  One victim was suspended over the ground in a rice bag and beaten in

the bag.  *Id.* ¶ 33.  Other victims had molten plastic or acid dripped on their bodies, or had cigarettes extinguished on their skin.  *Id.* ¶¶ 33, 35, 38.  Correa and his co-conspirators placed heavy bags of sand on another victim's back and stomped on him, while another victim had a pistol placed in his mouth.  *Id.* ¶¶ 33, 35.  One of these victims, Victim 2 listed in Count 3, was a dual citizen of the United States and The Gambia at the time of the torture.  Before becoming a naturalized citizen of the United States in March 1998, Victim 2 served in the U.S. Navy Reserve from 1986 to 1996.

On September 6, 2016, an application was submitted electronically requesting a G-2 visa for Correa to travel as security to the Gambian Vice President to the United Nations General Assembly meeting that was to be held later that month.  A G-2 visa is a temporary, nonimmigrant visa that authorizes representatives of a recognized government to travel to the United States temporarily to attend meetings of an international organization, such as the United Nations.  Although the visa application stated that Correa's intended date of arrival in the United States was September 17, 2016, he did not enter the United States until December 16, 2016, after President Jammeh lost the Gambian election and nearly three months after the U.N. General Assembly meeting.  Correa then overstayed his visa by failing to depart the United States in January 2017 as scheduled.

Correa remained in the United States unlawfully until he was administratively detained by Homeland Security Investigations on September 17, 2019.  Thereafter, Correa engaged in U.S. immigration proceedings in an attempt to stay in the United States.  Following his detention pending the immigration proceedings, Correa consented to an interview in which he admitted that he had been a member of the

Junglers.  He also admitted that he had traveled to the United States in December 2016 and intentionally overstayed his visa.  Correa told agents that he had no valid U.S.-issued identification and was working for cash "under the table."

On June 2, 2020, a grand jury sitting in the U.S. District Court for the District of Colorado returned a seven-count Indictment charging Correa with one count of conspiracy to commit torture and six counts of torture, one for each of six victims, in violation of 18 U.S.C. §§ 2340-2340A.  Correa made his initial appearance and was detained pending trial.  (Doc. # 20)  On December 1, 2023, he filed his motion to dismiss.

## **Argument**

Correa is being prosecuted under the Torture Act, which is codified at 18 U.S.C. §§ 2340-2340A.  The Torture Act was passed by Congress "to implement the United States's obligations under the Convention Against Torture, which itself was the product of a long-evolving international consensus against torture committed by official actors." *United States v. Belfast*, 611 F.3d 783, 801 (11th Cir. 2010).  Section 2340A specifically provides jurisdiction to prosecute someone who commits or attempts to commit torture "outside the United States" when:

(1) the alleged offender is a national of the United States; or

(2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender.

18 U.S.C. § 2340A(b)(1) & (b)(2).  Correa does not challenge that the statute's plain language applies to torture "outside the United States," nor does he raise a facial challenge to the constitutionality of its extraterritorial reach.  He also does not dispute

that he was "present in" the United States to satisfy the jurisdictional requirement of § 2340A(b)(2).

Instead, he argues that his Indictment should be dismissed because the extraterritorial application of the Torture Act to his case violates the Due Process Clause of the Fifth Amendment.  Mot. at 1-2.  He claims that due process requires a nexus between a defendant's conduct and the United States when applying a criminal statute extraterritorially.  He is incorrect.

Even if a nexus were required, it exists in this case.  Correa fled to the United States where he lived for years under assumed names, used the U.S. immigration process to try to avoid returning to The Gambia—the country he claims is the only one that should prosecute him for his actions—and directed some of his criminal acts at a U.S. citizen.  It is neither arbitrary nor fundamentally unfair to prosecute him for his acts in The Gambia under the United States' statutory implementation of an international treaty covering universally condemned conduct.

## I. Due Process does not demand a nexus between the torture committed by Correa and the United States.

The Tenth Circuit has not addressed whether the Due Process Clause imposes requirements for the prosecution of extraterritorial acts committed by a defendant.  But its sister circuits have held that a foreign national's prosecution for crimes committed abroad comport with due process when a prosecution is not "arbitrary or fundamentally unfair."[1]

---

[1] See *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) (describing "ultimate question" as whether "application of the statute to the defendant [would] be arbitrary or fundamentally unfair"); see also *United States v. Gruezo*, 66 F.4th 1284, 1293 (11th Cir.

In determining whether a particular prosecution is arbitrary or fundamentally unfair, courts have primarily focused on notice, that is, whether the defendant should have known that their conduct was illegal.  See, e.g., *United States v. Murillo*, 826 F.3d 152, 157-58 (4th Cir. 2016) (kidnapping and murder were "self-evidently criminal so as to thwart the argument that [defendant's] prosecution was fundamentally unfair"). Notably, "[f]air warning" requires only that defendants "would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere"—not that they could be haled into a U.S. court.[2]  *Brehm*, 691 F.3d at 554; *Epskamp*, 832 F.3d 169 (knowledge of U.S. jurisdiction is "legally irrelevant for purposes of due process").  This focus on notice mirrors Supreme Court precedent defining due process, even for foreign defendants involuntarily brought into the United States, in terms of whether they were "fairly appri[s]ed of the charges against him" and received "a fair trial in accordance with constitutional procedural safeguards."  *United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992) (internal quotation marks omitted); see also *Medina*

---

2023); *United States v. Iossifov*, 45 F.4th 899, 914 (6th Cir. 2022); *United States v. Brehm*, 691 F.3d 547, 553 (4th Cir. 2012); *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003); *United States v. Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002); *United States v. Suerte*, 291 F.3d 366, 377 (5th Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Davis*, 905 F.2d 245, 249 n.2 (9th Cir. 1990) (identifying "ultimate question").

[2] Although some cases have said that due process requires that the defendant "should reasonably [have] anticipate[d] being haled into court in this country," *United States v. Shi*, 525 F.3d 709, 722 (9th Cir. 2008) (internal quotation marks omitted), they have derived that view from the minimum-contacts test for personal jurisdiction in civil cases. See *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 157 (9th Cir. 1998).  As explained below, however, that principle of civil law does not apply in criminal cases. See *infra* p.18-19.  The criminal-law-specific analysis in *Murillo*, *Brehm*, *Ali*, *United States v. Epskamp*, 832 F.3d 154 (2d Cir. 2016), and *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), is most apt.

*v. California*, 505 U.S. 437, 443 (1992) (noting that, in criminal cases, "beyond the specific guarantees enumerated in the Bill of Rights," which "speaks in explicit terms to many aspects of criminal procedure," "the Due Process Clause has limited operation").

Under this framework, courts have thus far identified three circumstances which independently satisfy due process when prosecuting the extraterritorial acts here:

(1) the prosecution is of a universally condemned or self-evidently criminal act,

(2) the prosecution results from Congress's implementation of a treaty to which the United States is a party, or

(3) there is a nexus between the defendant and the United States.

See *Shi*, 525 F.3d at 722-24.

Correa discusses the third circumstance, a nexus, at length in his motion. Although sufficient, however, a nexus is not necessary. In two cases addressing prosecutions for extraterritorial conduct, the Second Circuit has said that "there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 111 (quoting *Davis*, 905 F.2d at 248-49); accord *Al Kassar*, 660 F.3d at 118. In each case, a nexus existed. The *Al Kassar* defendants conspired "to sell arms to [a Colombian paramilitary organization] with the understanding that they would be used to kill Americans and destroy U.S. property." 660 F.3d at 118. In *Yousef*, the foreign-national defendants conspired "to attack a dozen United States-flag aircraft [in Southeast Asia] in an effort to inflict injury on this country and its people and influence American foreign

policy." 327 F.3d at 79-80, 112.[3]  The Second Circuit, accordingly, does not appear to have confronted the question of whether some other form of notice—such as a treaty or universal condemnation—could satisfy due process, and it is unclear that it would require a nexus in those situations.

Even if Second Circuit and Fifth Circuit precedent were read to require a nexus in every case, Correa is wrong in contending that the Fourth and Ninth Circuits have joined that holding.  The Fourth Circuit agrees that a nexus can satisfy due process, but it has not held that such a nexus is required.  *Brehm*, 691 F.3d at 552 n.7 (reserving the question); *Murillo*, 826 F.3d at 157-58 (recognizing treaty on Internationally Protected Persons and the "self-evidently criminal" nature of murder and kidnapping provided sufficient due process notice).[4]  And despite the Second Circuit's reliance on the Ninth Circuit's decision in *Davis*, 905 F.2d at 248-49, for a nexus requirement, the Ninth Circuit has explicitly rejected that a nexus is always required to satisfy due process. *Shi*, 525 F.3d at 723-724 (criticizing Second Circuit's failure to consider precedents that suggest no nexus is needed for universally condemned conduct).

---

[3] Although Correa does not discuss Fifth Circuit precedent, that court has used similar language in two cases addressing conduct with a strong nexus to the United States. *United States v. Rojas*, 812 F. 3d 382, 393 (5th Cir. 2016) (finding a nexus where "the defendants were charged with acting with the intent or knowledge that drugs would be unlawfully imported into the United States"); *United States v. Lawrence*, 727 F.3d 386, 396 (5th Cir. 2013) (single paragraph finding a nexus where the defendant lived in Texas and committed extensive criminal conduct in the United States).  That court has also held, however, that certain extraterritorial prosecutions do not require a nexus. *Suerte*, 291 F.3d at 375.

[4] In *United States v. Ayesh*, 702 F.3d 162, 167 (4th Cir. 2012), the Fourth Circuit identified facts establishing a nexus sufficient to satisfy due process without deciding whether such a nexus is required.  And *United States v. Mohammed-Omar*, 323 F. App'x 259 (4th Cir. 2009), is an unpublished, non-precedential opinion.

Correa identifies—and the government is aware of—only a single appellate case overturning a conviction for extraterritorial conduct on due process grounds: *United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006).[5]  Yet Perlaza fits within the three-part framework identified above.  In relevant part, *Perlaza* involved a prosecution under the Maritime Drug Law Enforcement Act (MDLEA) of the foreign crew of a Colombian ship intercepted near South America.  *Id.* at 1156.  The Ninth Circuit held that because there was no "evidence indicating that the cocaine [onboard] . . . had any nexus to the United States," the prosecution violated due process.  *Id.* at 1169, 1178.  This holding neither disturbs nor conflicts with the rule that due process does not require a nexus to prosecute universally condemned conduct or that governed by a treaty.  See *Shi*, 525 F.3d at 722 (synthesizing these principles).  In *Perlaza*, the Ninth Circuit determined that drug-trafficking is not a universally condemned activity.  439 F.3d at 1162-63 (rejecting 11th Circuit decisions that held otherwise); see also *Shi*, 525 F.3d at 722 (explaining earlier precedent required nexus for drug-trafficking on high seas because "some states do not consider such conduct criminal").  And although *Perlaza* did not discuss this fact, the MDLEA was not passed to implement an international treaty obligation, and thus the second due process proxy was also absent.  See *United States v. Cardales-Luna*, 632

---

[5] *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015), is likewise inapposite.  The district court there dismissed the indictment against foreign defendants for violating U.S. bribery and wire-fraud statutes via solely extraterritorial conduct.  *Id.* at 1126-1127.  The court's holding that those statutes, 18 U.S.C. §§ 666 & 1343, do not overcome the statutory-interpretation canon against extraterritoriality and thus did not apply to the defendants' conduct fully explained the holding, *id.* at 1127-1132, rendering the due process analysis dicta.  Moreover, the court's decision to evaluate a nexus to the United States is arguably consistent with the principles outlined above because bribery and wire fraud are not universally condemned in the same manner as, for example, hostage taking, piracy, and torture.

F.3d 731, 749 (1st Cir. 2011) (Torruela, J. dissenting).  Without those other due process

proxies, a nexus was required to prosecute extraterritorial drug-trafficking in *Perlaza*.

439 F.3d at 1168-69.

But as each of the three independent proxies for due process is present here—

universal condemnation, treaty implementation, and a nexus—this Court can deny

Correa's motion to dismiss based on any (or all) of them.

### II. Because torture is universally condemned and self-evidently criminal, it is not arbitrary or fundamentally unfair to prosecute Correa in the United States.

In this case, due process is first satisfied "because the universal condemnation of

the offender's conduct puts him on notice that his acts will be prosecuted by any state

where he is found."  *Shi*, 525 F.3d at 723 (concluding no nexus was required when the

defendant's acts constituted piracy and piracy was universally condemned).  Several

circuits recognize that due process allows for prosecution of acts committed abroad that

are universally condemned or self-evidently criminal.  See, e.g., *id.*; *United States v.*

*Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002) (no nexus required for conduct that "is

condemned universally by law-abiding nations"); accord *Murillo*, 826 F.3d at 157-58

(prosecuting "self-evidently criminal" extraterritorial acts satisfies due process); *Gruezo*,

66 F.4th at 1293 (no due process violation to prosecute universally condemned crime).

Correa's brutal torture of multiple people is a universally condemned act and self-

evidently criminal.  Similar to the murder and kidnapping in *Murillo*—where the

defendant did not know the victim was a United States federal agent and did not

intentionally direct his conduct at a United States citizen—Correa's conduct here was

"self-evidently criminal so as to thwart the argument that his prosecution was fundamentally unfair."  828 F.3d at 157-58 (internal citations omitted).

In addition to repeatedly beating victims with fists, boots, pipes, and branches, Correa and his co-conspirators subjected victims to electrocution on various parts of their bodies.  Indictment ¶¶ 33-38.  They dripped molten plastic or acid on the victims' bodies, or extinguished cigarettes on their skin.  *Id.*  They suspended one victim over the ground in a rice bag and proceeded to beat the victim while the victim was in the bag.  *Id.* ¶ 33.  A defendant who conspires to torture and ultimately tortures "should understand that he will likely face criminal prosecution somewhere."  *Murillo*, 826 F.3d at 157-58.

Torture defies international human rights norms, is "repugnant to all civilized peoples," and renders its perpetrators "enem[ies] of all mankind."  *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018).  "[It] is illegal under the law of virtually every country in the world and under the international law of human rights."  *Nuru v. Gonzales*, 404 F.3d 1207, 1222-23 (9th Cir. 2005).  Moreover, the right to be free from physical torture is "universally proclaimed by all nations."  *Filartiga v. Peña-Irala*, 630 F.2d 876, 890 (2d Cir. 1980) ("Among the rights, as we have noted, is the right to be free of physical torture.").  The Universal Declaration of Human Rights, adopted by the United Nations in 1948, states that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."  Universal Decl. of Human Rights, Dec. 10, 1948, U.N. Doc. A/810, art 5.

More than 30 years ago, the Ninth Circuit described the right to be free from torture as a non-derogable *jus cogens* norm:

> [W]e conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*. The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate. To subject a person to such horrors is to commit one of the most egregious violations of the personal security and dignity of a human being. That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens.

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992); see also

*United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452 at *10 (S.D. Fla. July

5, 2007) (torture is *jus cogens* norm). In international law, *jus cogens* are norms that

apply universally to states and individuals. See *Nuru*, 404 F.3d at 1222. While

customary international law "rests on the consent of states," *id.*, *jus cogens* norms do

not depend solely on the consent of the states for their binding force, but rather,

transcend such consent. *Siderman de Blake*, 965 F.2d at 717.

Citing *Yousef,* Correa argues that torture is not a universal jurisdiction offense.

Mot. at 17. But as *Yousef* recognized, jurisdiction and due process are separate

inquiries. Compare 327 F.3d at 97-110 (jurisdiction properly conferred by statute in

absence of universal jurisdiction) with 327 F.3d at 111-12 (addressing due process of

exercising that statutory jurisdiction); see also *Shi*, 525 F.3d at 724-25 (addressing

statutory jurisdiction after concluding that the prosecution satisfied due process).

Correa's argument elides this distinction. Although "universal condemnation" is

necessary for "universal jurisdiction," see *Yousef*, 327 F.23 at 105, the universal

condemnation of a crime can satisfy due process independent of universal jurisdiction.

See *Shi*, 525 F.3d at 722-23 & n.5 (discussing *Yousef*). "[I]t is the 'universal

condemnation of the offender's conduct,' not some theory of universal jurisdiction," that guides the due process analysis.  *Ali*, 718 F.3d at 945 (quoting *Shi*, 525 F.3d at 723).

Accordingly, Correa was on global notice that he could be prosecuted for his self-evidently criminal and universally condemned conduct in a United States court.

### III.     The Convention Against Torture independently provides global notice that satisfies due process.

The Due Process Clause "demands no more" than the "global notice" provided by a treaty "that certain generally condemned acts are subject to prosecution by any party to the treaty."  *Ali*, 718 F.3d at 944.  Congress enacted the Torture Act to implement the Convention Against Torture.  The CAT "establishes a regime for international cooperation in the criminal prosecution of torturers" and requires "each State Party . . . to establish criminal jurisdiction to prosecute alleged torturers who are found in its territory or to extradite them."  S. EXEC. REP. 101-30 at 6 (1990).  President Ronald Reagan signed the CAT on April 18, 1988, *Auguste v. Ridge*, 395 F.3d 123, 130 (3d Cir. 2005), and submitted the CAT to the Senate for advice and consent to ratify, *id.* at 131 (citing S. Exec. Rep. 101-30 at 2, 7 (1990)).  On October 21, 1994, the United States became a party to the Convention.  *Id.* at 132 (citing 1830 U.N.T.S. 320, 321, 322 (1994)).

Because the treaty was not self-executing, on April 30, 1994, the United States enacted 18 U.S.C. § 2340A, pursuant to Articles 4 and 5 of the Convention. Specifically, Congress enacted the torture statute to provide CAT Article 5(2) jurisdiction over "foreign offenders committing torture abroad who are later found in territory under U.S. jurisdiction."  S. EXEC. REP. 101-30 at 20.  The United States' ratification went

into effect on November 20, 1994.  *Cadet v. Bulger*, 377 F.3d 1173, 1179 (11th Cir. 2004).  Correa's illegal acts came afterward.

An international convention "expressly provid[ing] foreign offenders with notice that their conduct will be prosecuted by any state signatory" satisfies the requirements of due process.  *Ali*, 718 F.3d at 945.  Correa is incorrect that the D.C. Circuit "stands alone" in relying solely on a treaty to establish due process.  Mot. at 15.  See *United States v. Murillo*, 826 F.3d 152, 157 (4th Cir. 2016) (The Internationally Protected Persons "Convention alone gave Bello notice sufficient to satisfy due process."); see also *Yousef*, 327 F.3d at 97 (noting that "no nexus requirement delimits the obligation of parties to the [Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation] to prosecute offenders").

Although many types of conduct—like torture—are both universally condemned and the subject of a treaty, each fact provides an independent basis for satisfying due process.  For example, the Ninth Circuit has held that a treaty is sufficient.  Although at times *Shi* combined "the universal condemnation of Shi's conduct and the existence of the Maritime Safety Convention" to conclude that Shi received all of the notice due process requires, 525 F.3d at 724, the opinion treats the two as independently sufficient grounds elsewhere:

> Because these are acts of piracy, and because such acts are universally condemned, due process does not require the same nexus between the offender and the United States as does the MDLEA.
>
> *Moreover*, due process does not require the same nexus between violators of § 2280 and the United States because § 2280 implements the Maritime Safety Convention, which expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory.

*Shi*, 525 F.3d at 723 (emphasis added); *id.* at 724 (as piracy "is a universally-condemned crime, a jurisdictional nexus is not required to satisfy due process."). "*Shi*'s comparison of § 2280 to piracy was an alternate holding, not a necessary premise to its conclusion that a treaty may provide notice sufficient to satisfy due process." *Ali*, 718 F.3d at 945. Where an extraterritorial statute "implements [a treaty], which expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory," no nexus is required to satisfy due process. *Shi*, 525 F.3d at 723.[6]

Like the Conventions in *Shi* and *Ali*, the CAT has an "extradite or prosecute" provision, and it therefore provides due notice to offenders that they are subject to prosecution by any state party, regardless of their nationality, the location of their offense, or whether their country of citizenship is a party to the treaty. CAT Art. (5) & Art. (7). The CAT was unanimously adopted by the UN General Assembly on December 10, 1984. G.A. Res. 39/46 U.N. GAOR, 39th Sess., Supp. No. 51 at 197, U.N. Doc. A/RES/39/46, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (Dec. 10, 1984). Since then, 173 countries have become a party to the UN CAT, including The Gambia.

### IV. The combination of an international treaty and universally condemned acts plainly satisfies due process.

Regardless of whether the universally condemned nature of torture or the existence of the Convention Against Torture satisfy due process on their own, the combination of the two surely does. The Eleventh Circuit has noted that the Fourth,

---

[6] By citing to *Shi*'s footnote 5, Correa again conflates the question of jurisdiction with due process. Mot. at 17. Footnote 5 simply recognized that a treaty does not create jurisdiction in U.S. courts (or any other signatories' courts) on its own. But there is no jurisdictional question in Correa's case. The Torture Act creates the jurisdiction.

Ninth, and D.C. Circuits have all held that the global notice provided by a treaty satisfies due process for a universally condemned crime. See *United States v. Noel*, 893 F.3d 1294, 1304-05 (11th Cir. 2018) (collecting and discussing cases). Given the widespread acceptance of the CAT and its underlying principles, Correa was on global notice that he could be prosecuted for his universally condemned conduct.

### V.   Based on his conduct, the nexus between Correa and the United States satisfies due process.

Even if Correa is correct that a nexus is required to meet due process, such a nexus is present here. The "burden is a heavy one" for a defendant seeking to show that extraterritorial application of a statute violates due process. *Epskamp*, 832 F.3d at 168 (citation omitted). Indeed, in the only circuit decision to find an insufficient nexus for due process, "the Government conceded at oral argument" that it had presented no evidence of a nexus. *Perlaza*, 439 F.3d at 1169 (finding no nexus when the foreign defendants were arrested in foreign waters for drug trafficking, and there was no evidence that the drugs were intended for the United States).

In contrast to *Perlaza*, two significant facts connect Correa's conduct to the United States, and while each alone is sufficient to satisfy a nexus test, taken together the prosecution is neither arbitrary nor unfair:[7]

---

[7] The First Circuit has held that a nexus is not required but has been guided by international law principles to which a nexus can be relevant in determining whether due process is satisfied. *Cardales*, 168 F.3d at 553. To the extent this Court looks to similar principles, the Government submits that the passive personality and protective principle apply here. See Restatement (Fourth) of Foreign Relations Law § 402 (2018) (identifying principles); *Yousef,* 327 F.3d at 91 n.24 (same).

With respect to passive personality, one of the victims alleged in the Indictment was a dual citizen of the United States and The Gambia at the time of the torture. With respect to the protective principle, the United States has a strong interest in upholding

(1) Correa was found in the United States after actively seeking a safe haven in the United States, overstaying his visa, living in Colorado until he was arrested by U.S. authorities, and using the U.S. immigration process in his attempts to stay in the United States, and

(2) one of Correa's victims was an American citizen at the time of his torture.

### a. Correa deliberately sought to live in the United States after his criminal acts.

Unlike *Perlaza* or the various decisions addressing the Maritime Drug Law Enforcement Act, this is not a case where the United States captured or sought extradition of a criminal from outside its borders.  Correa purposefully availed himself of the benefits and burdens of escaping to the United States.  After he received a visa to travel to the United States as a representative of the Gambian government, he failed to travel until after Jammeh lost the election—*i.e.*, when the President for whom he committed torture could no longer protect him in The Gambia.  He then purposely remained here beyond his authorized stay, a fact he admitted to law enforcement.  He chose to start a new life in this country and hid inside the United States by using false identities and working for cash "under the table."  To remain in the United States undetected, he obtained a driver's license, multiple credit cards, receipts, checkbooks, and other forms of identification in multiple names, including Anthony Collins, Tony Collins, Joseph Collins, Marshall Fauntleroy, Ronald Hunter, and John Brandon.  After Correa was caught in the United States, he attempted to use the U.S. immigration process to resist returning to the country he claims is the one that should prosecute him for his crimes.  Mot. at 6.  A defendant cannot "use[ ] this country as a home base and

---

its treaty obligations and ensuring that the United States does not become a safe haven for foreign nationals who commit criminal acts.

t[ake] advantage of its laws" and then "complain about being subjected to those laws." *United States v. Baston*, 818 F.3d 651, 670 (11th Cir. 2016).

The United States has a strong interest in ensuring that it does not become a safe haven for those who have committed human rights violations abroad. See, e.g., *No Safe Haven: Law Enforcement Operations Against Human Rights Violators in the U.S.: Hearing Before the Lantos Human Rights Comm. of the H. Comm. on Foreign Affairs,* 112th Cong. (2011), (statement of John P. Woods, Deputy Assistant Director, U.S. Immigration and Customs Enforcement). Correa's choice to hide out in the United States, and specifically the District of Colorado, after committing acts of torture demonstrates that prosecution in this Court is neither arbitrary nor unfair. Cf. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 127 (2013) (Breyer, J., concurring in the judgment) (explaining that "preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind" is an "important American national interest").

Indeed, there can be no serious argument that it is arbitrary or fundamentally unfair to hold Correa accountable in the United States when he actively came here, stayed here, and attempted to use the U.S. immigration system to avoid returning to the country where he committed heinous acts of torture. The civil personal jurisdiction cases on which Correa relies, Mot. at 18-19, are "inapposite." *Ali*, 718 F.3d at 944. Cases such as *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and *Asahi Metal Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102 (1987), "deal with non-resident corporations subject to liability for placing goods in the stream of commerce of another state." *Perez-Oviedo*, 281 F.3d at 403. These civil

extraterritorial holdings, therefore, "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction." See *United States v. Bowman*, 260 U.S. 94, 98 (1922).

Moreover, although *International Shoe* expanded the presence required to meet personal jurisdiction to include jurisdiction over those who have minimal contacts with a forum, it did not eliminate personal jurisdiction over those *physically present* in a forum. *Burnham v. Superior Ct. of California, Cnty. of Marin*, 495 U.S. 604, 619 (1990).  The cases Correa cites involve questions of jurisdiction when—unlike him (or any defendant prosecuted under § 2340A(b)(2)'s "found in" jurisdiction)—a litigant is not physically present in the forum.  See, e.g., *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (minimum contacts required "if the defendant be not present within the territory of the forum").  Yet in criminal cases, defendants are "in [the court's] jurisdiction because they [are] actually in its custody," that is, physically present. *Ford v. United States*, 273 U.S. 593, 607 (1927); see also, e.g., 18 U.S.C. § 3238 (venue proper for prosecution for extraterritorial conduct in the district where the defendant "is arrested or is first brought").  This is all the more true when the defendant's presence in the forum is voluntary.  E.g., *Burnham*, 495 U.S. at 639 (Brennan, J. concurring).

In sum, while precedent makes clear that a nexus to the United States for a prosecution of extraterritorial conduct is not required to satisfy due process, such a nexus certainly exists when Correa chose the United States as his sanctuary to avoid accountability for his crimes.

### b. The torture of a dual U.S.-Gambian citizen implicates significant U.S. interests.

Even if this Court were to hold that both a nexus is required and that Correa's flight and residence in the United States are not sufficient, Counts 1 and 3 contain the additional nexus that Victim 2 is a dual citizen of the United States and The Gambia.[8] The United States undoubtedly has a significant interest in protecting its own citizens from torture.

Victim 2 listed in Count 3 of the Indictment served in the U.S. Navy Reserve from 1986 to 1996 and became a naturalized United States citizen in March 1998, well before the conduct charged in the Indictment.[9]  He was a citizen of the United States when Correa and other Junglers restricted his ability to breathe by placing a plastic bag over his head and severely beat him with their fists, boots, and branches.  Indictment ¶ 34.  He was a citizen when they further struck him in the head with a plastic chair and threatened him with death by placing the barrel of a pistol in his mouth.  *Id.*

---

[8] Should the Court rely on this fact to deny Correa's motion to dismiss with respect to Counts 1 and 3, the Court will still need to independently determine whether Correa's due process rights are protected for the remaining counts.

[9] That the victim was a dual citizen rather than solely an American citizen is of no legal import.  The Supreme Court has found that dual nationality "is a status long recognized in the law" and "a person may have and exercise rights of nationality in two countries and be subject the responsibilities of both."  *Kawakita v. United States*, 343 U.S. 717, 723 (1952).  Dual citizens have all of the rights, and subsequently all of the legal protections, of someone who is a citizen of only the United States.  This principle is affirmed by the State Department, which states that "dual nationality means a person is a national of two countries" and "either country has the right to enforce its laws."  *Dual Nationality*, DEP'T OF STATE: https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/Relinquishing-US-Nationality/Dual-Nationality.html (last visited Jan. 29, 2024).

It does not matter whether the torture occurred overseas or whether Correa knew the victim was an American citizen.  Due process was met in *Murillo* when a Colombian national was prosecuted in the United States for the kidnapping and murder of a federal law enforcement agent, even though the defendant did not know the victim was a United States federal agent.  *Murillo*, 826 F.3d at 157 ("it is not arbitrary to prosecute a defendant in the United States if his actions affected significant American interests— even if the defendant did not mean to affect those interests").  The Second Circuit similarly recognized that the nexus it requires for due process was satisfied where a defendant did not realize the airplane he used for drug trafficking was registered in the United States:

> Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.

*Epskamp*, 832 F.3d at 169 (quoting *Al Kassar*, 660 F.3d at 119).

Accordingly, the fact that an American was harmed as a result of Correa's conduct indicates that the instant prosecution is neither arbitrary nor unfair.

## VI.    Correa's remaining arguments are without merit.

Throughout his motion, Correa attempts to shoehorn various claims into his Fifth Amendment argument.  First, he claims that he is entitled to a jury of his peers and to one that is "comprised of members of the community who were affected by the crime itself."  E.g., Mot. at 16.  Not so.  Article III, Section 2, clause 3 of the Constitution provides that when a crime is "not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."  Congress has directed that "[t]he trial of all offenses begun or committed out of the jurisdiction of any particular

State or district[ ] shall be in the district in which the offender is arrested."  18 U.S.C. § 3238.  Because Correa was arrested in the District of Colorado, his prosecution here is appropriate.  And rather than require a jury from a community affected by the crime, the Supreme Court has explained, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

Second, Correa is not entitled to dismissal of the Indictment due to any premature concerns about compulsory process.  The right to compulsory process for criminal defendants is not unlimited.  See *United States v. Beyle*, 782 F.3d 159, 170 (4th Cir. 2015).  One limit is "the ability of the district court to obtain the presence of a witness through service of process."  *Id.*  As such, an indictment should not be dismissed solely because the district court lacks the power "to secure the appearance of a foreign national located outside the United States."  *Id.*

Facing a similar challenge, the district court in the *Belfast* case explained that, "[i]t is also not unconstitutional for the Government to prosecute a case where most of the physical evidence and witnesses are located in foreign countries."  *United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452, at *17 (S.D. Fla. July 5, 2007) (citing *United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962)).  Other courts have reached the same conclusion.  The D.C. Circuit, for example, held that "a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution."  *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989) (citations omitted); see also *Greco*, 298 F.2d at 251 (holding that a defendant cannot "forestall trial simply by specifying

that a certain person living where he could not be forced to come to this country was required as a witness in his favor").

Furthermore, due process cannot turn on Correa's jury and compulsory process arguments.  Such a reading of the Due Process Clause would invalidate the prosecution of every extraterritorial offense—as every such offense would suffer from the same potential issues.  Correa does not dispute that prosecuting acts occurring outside the United States *can* satisfy due process when the nexus test that he proposes is met.  Yet his jury and compulsory-process complaints would remain in those cases, preventing the prosecution of nearly every extraterritorial offense.

## Conclusion

Correa participated in the torture of multiple victims, including a United States citizen. Anyone would recognize such acts are wrong.  He faces charges for those acts in the district where he lived for years trying to escape responsibility for his crimes.  It is not "arbitrary or fundamentally unfair" to hold him accountable in this Court.

His motion should be denied.

Respectfully submitted,

COLE FINEGAN
United States Attorney

*s/ Melissa Hindman*
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0401
E-mail:  Melissa.Hindman@usdoj.gov
Attorney for the Government

*s/ Matthew Kirsch*

First Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0401
E-mail:  Matthew.Kirsch@usdoj.gov

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

*s/Marie S. Zisa*
Marie S. Zisa
New York Bar No. 5663265
Trial Attorney
United States Department of Justice
Criminal Division
Human Rights and Special Prosecutions
1301 New York Ave. NW, 12th Floor
Washington, D.C. 20530
Telephone: (202) 305-3731
Facsimile: (202) 305-4624
Email: Marie.Zisa@usdoj.gov

## **CERTIFICATE OF SERVICE**

       I hereby certify that on January 30, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties on record.

 

       *s/ Melissa Hindman*
       Assistant U.S. Attorney
       U.S. Attorney's Office
       1801 California St., Ste. 1600
       Denver, CO 80202
       Telephone: 303-454-0100
       Fax: 303-454-0401
       E-mail:  Melissa.Hindman@usdoj.gov
       Attorney for the Government